IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.                              Case No. 4:22-cr-00357-KGB

TERILYN TITTERINGTON                                                                        DEFENDANT

## ORDER

Pending is defendant Terilyn Titterington's motion to suppress and brief in support (Dkt. No. 74). The Court understands that Ms. Titterington seeks to suppress all physical evidence obtained from law enforcement's search of room 310 at the La Quinta Inn in Russellville, Arkansas, on January 31, 2022 (*Id.*, at 11–12). The United States of America ("Government") responded in opposition to the motion (Dkt. No. 79). The Court conducted a hearing on the motion on April 1, 2025, at which Ms. Titterington, her counsel, and counsel for the Government were present. The Court received evidence and testimony and heard argument at the hearing. For the following reasons, the Court denies the motion to suppress (Dkt. No. 74).

   I.   **Factual Background**

      A.   **Testimony Of Ms. Titterington**

Ms. Titterington took the stand, was sworn, and testified as follows regarding her Fourth Amendment standing to bring the motion to suppress. Ms. Titterington testified that, on January 27, 2022, she was at the La Quinta Inn in Russellville, Arkansas ("La Quinta"), with Jeremiah Bethel who was checking into the hotel. Ms. Titterington testified that Mr. Bethel was renting a room there by the day. She did not answer when asked during direct examination whether she and Mr. Bethel had agreed upon how long they intended to stay at the La Quinta. She explained that

she had stayed there four days before her arrest on January 31, 2022. She claimed to share a room with Mr. Bethel.

Ms. Titterington was then asked specifically about January 31, 2022, and room 310 at the La Quinta. Ms. Titterington testified that she had a key to room 310, that she was occupying the room with clothes and two pit bull dogs inside, and that she had an expectation of privacy in room 310.

  B.  Events Of January 2022

The Government called Sergeant David Bevis ("Sergeant Bevis") with the Russellville, Arkansas, Police Department to testify. Sergeant Bevis has worked for the Russellville Police Department for 27 years and, as a sergeant, runs a criminal patrol unit. In addition, he teaches a class for the Criminal Justice Institute regarding criminal patrol and roadside interview.

In his job with the Russellville Police Department, Sergeant Bevis was familiar with Ms. Titterington before January 31, 2022. He knew her to have been arrested for drugs, whether as a user or seller. Before making contact with Ms. Titterington on January 31, 2022, Sergeant Bevis was at another hotel where he was involved in a separate case. From his stop at the other hotel, Sergeant Bevis learned information that led him to stop at the La Quinta. An individual at the other hotel was found with methamphetamine and, when questioned, said that they had obtained the methamphetamine from Ms. Titterington at the La Quinta. Sergeant Bevis also knew that there was a felony warrant out for the arrest of Ms. Titterington due to her missing court on drug charges, which he confirmed by running her name through ACIC/NCIC.

When Sergeant Bevis stopped at the La Quinta on January 31, 2022, Ms. Titterington and two other females were sitting on a bench outside the hotel and smoking. According to Sergeant

Bevis, Ms. Titterington knew that she had a felony warrant out for her arrest, and she was arrested that day and taken to the Pope County Detention Center.

According to his report, Sergeant Bevis identified the other two females on the bench with Ms. Titterington as Kimberly Brewer (Deathridge), who was Ms. Titterington's ex-sister-in-law, and Ms. Titterington's daughter (Dkt. No. 74-1, at 7). Sergeant Bevis spoke with Ms. Brewer, who explained that she was at the La Quinta to see Ms. Titterington's daughter and explained the daughter was on the third floor, although she could not provide the room number.

Sergeant Bevis made contact with staff at the La Quinta who confirmed that Ms. Titterington was not physically renting a room there. Instead, staff at the La Quinta confirmed who was staying on the third floor and that Mr. Bethel was staying in room 310. Sergeant Bevis knew Mr. Bethel. According to Sergeant Bevis, Mr. Bethel had been arrested in the past for, at the least, and was an associate of Ms. Titterington. Sergeant Bevis suspected that there could be drugs in room 310.

Sergeant Bevis discovered that Mr. Bethel rented rooms at the La Quinta starting on January 27, 2022, had been there for approximately five nights, and had switched from one room to another room. Sergeant Bevis learned that the morning of January 31, 2022, Mr. Bethel had re-rented room 310 in-person for that evening right before check-out. Federal Public Defender Investigator Steven Jackson testified that he obtained paperwork from the La Quinta, including the registration paperwork for January 31, 2022, with Mr. Bethel's name on the registration that indicates Mr. Bethel was renting room 310 (Def. Ex. 5; *see also* Dkt. No. 74-1, at 9-13). The form indicates that two guests were occupying the room. The registration form includes the pet agreement signed by Mr. Bethel that indicates two dogs, marked as "bullies" when asked what breed and reportedly each weighing 40 pounds, were also in the room (Def. Ex. 6).

3

At that point, Sergeant Bevis wanted to make contact with Mr. Bethel because Sergeant Bevis knew Mr. Bethel to be on probation with the State of Arkansas, was a probation absconder, had a search waiver on file, and had a couple of outstanding misdemeanor warrants, all of which Sergeant Bevis confirmed through a search of Mr. Bethel's name in ACIC/NCIC. Sergeant Bevis and another officer went to room 310 in an effort to make contact with Mr. Bethel. They knocked on the door of room 310 but could hear two dogs inside the room, so they retreated. Based on his experience, Sergeant Bevis assessed the dogs might be pit bulls belonging to Ms. Titterington. According to Sergeant Bevis, two pit bulls are generally with Ms. Titterington when she travels or stays somewhere else.

When Sergeant Bevis retreated, he returned to the front desk and asked hotel staff to attempt to call Mr. Bethel in room 310 and on Mr. Bethel's cell phone. Hotel staff made that attempt, but Mr. Bethel did not answer the phone in room 310 or his cell phone. Sergeant Bevis believes Mr. Bethel received that call because, when Ms. Titterington was being taken to the Pope County Detention Center, the fellow officer with Sergeant Bevis who had Ms. Titterington in custody saw in plain view while standing next to Ms. Titterington a message on Ms. Titterington's phone from Mr. Bethel that said, "They just tried to call me."

While at the front desk, Sergeant Bevis watched the video feed of room 310 to make sure that no one came or went from that room before law enforcement made entry into the room. He saw Ms. Titterington's family—specifically one or two of Ms. Titterington's daughters and an unidentified male subject based on Sergeant Bevis's recollection from watching the live feed video—enter the room and then about a minute later exit the room with the pit bulls and an item that could have been a large wallet or some item (*see also* Dkt. No. 74-1, at 7). Further, hotel staff

4

went back and looked at video from the time that Mr. Bethel re-rented room 310 in-person the morning of January 31, 2022, and saw no one leave room 310.

Sergeant Bevis testified that he believed Mr. Bethel was in room 310 at that time because Mr. Bethel was called by hotel staff at one point and Mr. Bethel said that he was not in the room but explained that someone was inside to take care of the dogs prior to their being taken, Sergeant Bevis believed that someone was inside who may be living there.  Further, a review of hotel video showed that no one left room 310 the morning of January 31, 2022, after Mr. Bethel re-rented room 310 in-person that morning, other than the individuals whom Sergeant Bevis observed on live feed video go into room 310 and return a minute later with two dogs and a small object like a wallet.  Sergeant Bevis testified that he believed that Mr. Bethel was living in room 310.

After the fellow officer returned from transporting Ms. Titterington to the Pope County Detention Center, he and Sergeant Bevis went into room 310 of the La Quinta, using a hotel key card to access the room and entering along with the La Quinta manager.  When Sergeant Bevis and the other officer made entry into room 310, the dogs were no longer in room 310.

Sergeant Bevis confirmed that Mr. Bethel had a search waiver on file and also believed that Mr. Bethel was in room 310 at the time he entered.  Sergeant Bevis also testified that there was a concern about destruction of evidence at the time he and the other officer were attempting to make contact with Mr. Bethel.

Ms. Titterington maintains that Mr. Bethel's residence for purposes of the search waiver on file is State Road 124 Atkins, Arkansas, which is the address listed on Mr. Bethel's parole search waiver.  Mr. Jackson obtained a copy of Mr. Bethel's signed search waiver form (Def. Ex. 3; *see also* Dkt. No. 74-2).  Mr. Jackson also obtained from the Arkansas Division of Community

Corrections paperwork stating that Mr. Bethel's home address on file with the Arkansas Division of Community Correction is 20168 S. State Route 124 Atkins, Arkansas (Def. Ex. 4).

In Sergeant Bevis's experience, parolees and probationers do not always live at their reported residence. Further, parolees and probationers do not always follow the law in Sergeant Bevis's experience. According to his testimony, at the time of these events, Sergeant Bevis believed that he could prove that Mr. Bethel was staying at the La Quinta, believed that Mr. Bethel was in room 310 at that time, and determined that, with Mr. Bethel's search waiver on file, a search of room 310 would be reasonable.

When Sergeant Bevis and the other officer entered room 310, no one was present in the room (Dkt. No. 74-1, at 7). Drug paraphernalia was in plain sight in the room (*Id.*). Sergeant Bevis and the other officer conducted a search of room 310 pursuant to Mr. Bethel's search waiver on file, locating more drug paraphernalia, various drugs in various quantities, firearms, ammunition, a safe later determined to contain additional firearms, male and female undergarments and clothing, a purse with female products inside but no wallet, and female items in the bathroom among the various items located and seized (*Id.*).

## II.  Discussion

### A.  Fourth Amendment Standing

"Fourth Amendment rights are personal and may not be asserted vicariously." *United States v. Green,* 275 F.3d 694, 698 (8th Cir. 2001). As such, Fourth Amendment "standing" is "'useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search,' but it does not implicate Article III jurisdiction." *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020) (quoting *Byrd v. United States*, 584 U.S. 395, 410 (2018)).

A defendant may demonstrate Fourth Amendment standing by showing a "legitimate expectation of privacy in the area searched or the item seized." *Id.* (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). The defendant must have both a subjective expectation of privacy and also be able to show that this expectation is one that "society is prepared to recognize as objectively reasonable." *Green*, 275 F.3d at 699. "There is no 'single metric or exhaustive list of considerations,' but a defendant's expectation of privacy must be grounded in property law or understandings that are recognized by society." *United States v. Juneau*, 73 F.4th 607, 613 (8th Cir. 2023) (quoting *Bettis*, 946 F.3d at 1027).

In *United States v. Jeffers*, the Supreme Court found that a defendant had Fourth Amendment standing to challenge the warrantless search of a hotel room rented by the defendant's aunts where the aunts:

> had given respondent a key to their room, that [defendant] had their permission to use the room at will, and that he often entered the room for various purposes. They had not given him permission to store narcotics there and had no knowledge that any were so stored. The hotel records reflected that the room was assigned to and paid for by [the aunts] alone.

342 U.S. 48, 50–52 (1951). Here there is record evidence that: (1) Ms. Titterington testified that she had been staying at the hotel room with Mr. Bethel since January 27, 2022 (2) Ms. Titterington testified that on January 31, 2022, she had a key to room 310 at the La Quinta; (3) female clothing was found in the dressers in the room, female products were found in the bathroom, and a purse was found with female products inside; and (4) Ms. Titterington's dogs were being kept in the room. Additionally, Ms. Titterington testified that she had a subjective expectation of privacy in room 310. Ms. Titterington therefore had a reasonable expectation of privacy in the room sufficient to demonstrate Fourth Amendment standing to challenge the search of Mr. Bethel's hotel room.

B.     **Fourth Amendment Analysis**

1.     **Legal Standard**

"The exclusionary rule is a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *United States v. Reed*, 978 F.3d 538, 541 (8th Cir. 2020) (quoting *Davis v. United States*, 564 U.S. 229, 232 (2011)). "The rule applies to deter future unlawful police conduct." *Id.* It is best understood as a judicially created supplement to the text of the Fourth Amendment, which is silent as to its enforcement. *Davis*, 564 U.S. at 231.

The Fourth Amendment itself provides that the "right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In accordance with this guarantee, it is a "basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). This generally includes searches of hotel rooms. *See Stoner v. California*, 376 U.S. 483, 490 (1964).

However, the Supreme Court has long recognized that "the warrant requirement is subject to certain reasonable exceptions." *King*, 563 U.S. at 459. One such exception is that "[a] warrantless search within the scope of a known parole condition is generally reasonable under the Fourth Amendment." *United States v. Blom*, Case No. 22-2957, 2024 WL 620280, at *2 (8th Cir. Feb. 14, 2024) (*per curiam*) (unpublished) (citing *Samson v. California*, 547 U.S. 843, 852 (2006)).

### 2. Applicability Of *Thabit*

In this case, Ms. Titterington cites *United States v. Thabit*, 56 F.4th 1145 (8th Cir. 2023), to argue that the search of Mr. Bethel's hotel room was constitutionally deficient (Dkt. No. 74, at 5–9). Specifically, Ms. Titterington argues that, although Mr. Bethel was a parolee with a warrantless search waiver on file, the search waiver was inapplicable because Sergeant Bevis did not have probable cause to believe that Mr. Bethel resided at the hotel room and because the search waiver did not apply to Ms. Titterington (*Id.*, at 5–9). Ms. Titterington also points out that the hotel clerk could not consent to the search of Mr. Bethel's room and that the La Quinta was not the residence listed on Mr. Bethel's search waiver (*Id.*, at 9–11).

In response, the Government argues that *Thabit* is distinguishable because, unlike in *Thabit*, the search at issue in this case did not implicate the residence of a third party (Dkt. No. 79, at 3). The Government points in this regard to the decision of the Arkansas Supreme Court in *State v. Bailey*, 687 S.W.3d 819 (Ark. 2024), which distinguished *Thabit* on this ground (*Id.*, at 3–4). The Government therefore argues that Sergeant Bevis needed "a degree of suspicion less than probable cause" to believe that Mr. Bethel resided at the hotel room (*Id.*, at 4). Finally, the Government argues that, even if the Court determines that Sergeant Bevis needed probable cause to believe that Mr. Bethel resided at the hotel room, Sergeant Bevis had such probable cause (*Id.*, at 4–5). Relatedly, the Government cites Arkansas case law for the proposition that a hotel room may be considered a "residence" under Arkansas law and that a person may have more than one residence (*Id.*, at 4).

The Court finds on the record before it that, regardless of whether *Thabit*'s holding requires that a probable cause standard be applied under the facts of this case, Sergeant Bevis had objective probable cause to believe that room 310 at the La Quinta was Mr. Bevis's residence, that Mr. Bevis

was a State of Arkansas parole absconder, and that Mr. Bevis was inside room 310 at the La Quinta at the time, and therefore Sergeant Bevis was entitled to conduct a warrantless search of room 310 at the La Quinta pursuant to the terms of Mr. Bethel's search waiver. Because the probable cause standard is met on the record evidence before the Court, even if a degree of suspicion less than probable cause was sufficient for law enforcement to enter and search room 310 that day, that lesser standard was satisfied, as well.

### 3. Probable Cause Analysis

Probable cause exists where "the facts available . . . warrant a [person] of reasonable caution" in a particular belief. *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). It is "an objective standard requiring that we afford officers substantial latitude in interpreting and drawing inferences from factual circumstances." *Watson v. Boyd*, 119 F.4th 539, 551 (8th Cir. 2024) (quoting *Brown v. City of St. Louis*, 40 F.4th 895, 900 (8th Cir. 2022)). Because it is an objective standard, "probable cause is not dependent on an [] officer's subjective belief." *United States v. Torres-Lona*, 491 F.3d 750, 756 (8th Cir. 2007). Rather, it is determined from the "totality of the circumstances." *United States v. Lukassen*, 103 F.4th 1325, 1329 (8th Cir. 2024), *reh'g denied*, Case No. 23-1047, 2024 WL 3356942 (8th Cir. July 10, 2024). Specifically in this context, the Eighth Circuit in *Thabit* stated that probable cause would warrant "a person of reasonable caution to believe the parolee resided at a certain location prior to a search." 56 F.4th at 1151.

In applying the probable cause standard to the specific issue of residence in Arkansas, the Court notes that the Arkansas Supreme Court has long held that residence "means the place of actual abode, and not an established domicile or home, to which one expects to return and to occupy at some future time." *Norton v. Purkins*, 157 S.W.2d 765, 767 (Ark. 1942) (quoting *Smith*

*v. Union Cnty.*, 11 S.W.2d 455, 456 (Ark. 1928)).  In *Norton*, the Arkansas Supreme Court summarized the law on residency in Arkansas as follows in the context of a venue dispute:

> We may conclude from the cases that, in contemplation of the attachment laws generally, residence implies an established abode, fixed permanently for a time for business or other purpose, although there may be an [understanding] existing all the while to return at some time or other to the principal domicile; but so difficult is it found to provide a definition to meet all the varying phases of circumstance that the determination of this question may present, that the courts say that, subject to the general rule, each case must be decided on its own state of facts.

*Id.* at 766 (alteration in original) (quoting *Krone v. Cooper*, 43 Ark. 547, 551 (1884)).  Arkansas courts have repeatedly reaffirmed the holding in *Norton* as to residency.  *See Goodwin v. Harrison*, 780 S.W.2d 518, 521 (Ark. 1989).  Arkansas case law likewise supports the propositions that a hotel may be regarded as a residence, *see Husband v. Crockett*, 115 S.W.2d 882, 885 (Ark. 1938), and that "[n]o particular length of time is necessary to establish residence." *Leathers v. Warmack*, 19 S.W.3d 27, 34 (Ark. 2000).  A person may have more than one residence for Fourth Amendment purposes.  *United States v. Risse*, 83 F.3d 212, 217 (8th Cir. 1996).

In this case, Sergeant Bevins knew that:  (1) Mr. Bethel was on probation with the State of Arkansas; (2) Mr. Bethel was a probation absconder, had a valid search waiver on file, and had misdemeanor warrants out; (3) Mr. Bethel had rented rooms at, and had been staying at, the La Quinta for several days, renting different rooms during that time; (4) other individuals reportedly obtained methamphetamine from Ms. Titterington at the La Quinta; (5) in Sergeant Bevis's experience, "local people in the drug community frequently rent hotel/motel rooms to use and sell contraband" (Dkt. No. 74-1, at 7); (6) Ms. Titterington's ex-sister-in-law was at the La Quinta on the third floor to see Ms. Titterington's daughter; (7) Mr. Bethel had re-rented in-person room 310 at the La Quinta just a few hours earlier; (8) dogs were being kept in room 310 at the La Quinta that day; (9) Mr. Bethel was called by hotel staff at one point, said that he was not in the room, but explained that someone was inside to take care of the dogs prior to their being taken; (10) Mr.

11

Bethel communicated with Ms. Titterington about the calls from hotel staff close in time to the calls being made; and (11) hotel staff after a review of the video footage reportedly saw no one leave room 310 at the La Quinta on January 31, 2022, after Mr. Bethel had re-rented in-person room 310 that day, other than the individuals whom Sergeant Bevis observed on live feed video go into room 310 and return a minute later with two dogs and a small object like a wallet.

Under these circumstances, the Court finds that, objectively speaking, an officer exercising reasonable caution would be warranted in believing that Mr. Bethel was maintaining an ongoing residence at the La Quinta with no apparent intention of departing.[1]

### 4. Conclusion On Fourth Amendment

For all of these reasons, the Court finds that Sergeant Bevis was entitled to undertake a warrantless search of Mr. Bethel's room at the La Quinta.

### III. Conclusion

For the foregoing reasons, the Court denies Ms. Titterington's motion to suppress (Dkt. No. 74).

It is so ordered this 3rd day of April, 2025.

_____
Kristine G. Baker
Chief United States District Judge

---

[1] The Court notes that Sergeant Bevis testified at the hearing on the motion that "I didn't have probable cause for a search warrant. I wouldn't have got a warrant because I had no probable cause to get a warrant." When subsequently asked whether he meant that he "didn't have probable cause to go into that hotel room," Sergeant Bevis clarified, "With a warrant." The Court understands Sergeant Bevis's testimony to mean that Sergeant Bevis did not believe he had sufficient probable cause to believe that there was contraband in the room so as to justify a search warrant, not that he lacked probable cause to believe that Mr. Bethel resided in room 310. In any case, even if Sergeant Bevis's testimony is construed to mean that Sergeant Bevis believed he lacked probable cause to believe that room 310 was Mr. Bethel's residence, probable cause, as the Court has noted, is an objective standard not dependent on the subjective beliefs of the officer conducting the search. *See Torres-Lona*, 491 F.3d at 756.